IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | )   Case No. 14-10180-EFM |
| | ) |
| ELDON L. BOISSEAU, | ) |
| | ) |
| *Defendant*. | ) |
| _____ | ) |

## MEMORANDUM AND ORDER

Defendant Eldon Boisseau was indicted on one count of tax evasion for unpaid taxes and interest of more than $1 million assessed between 1998 and 2008. Boisseau proceeded to a bench trial May 5-6, 2015. Having reviewed and considered the evidence, which was largely undisputed at trial, the Court finds Boisseau guilty of tax evasion in violation of 26 U.S.C. § 7201. The Court now issues its Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### I.    Background

1.    Eldon Boisseau is an attorney in Wichita.

2.    From 1998 through 2010, Boisseau earned his income by practicing law with three law firms: Turner & Boisseau, Chartered; Klenda, Mitchell, Austerman & Zuercher; and the Law Offices of Eldon L. Boisseau, LLC.

3.    On October 15, 2014, the United States indicted Boisseau for willfully attempting to evade or defeat payment of his federal income tax liabilities for 1998 through 2000, 2002 through 2005, 2007 through 2008, and a trust fund recovery penalty related to two periods in 1999.

## II.     Substantial Tax Due and Owing

4.     On December 17, 2000, Boisseau filed an amended income tax return, Form 1040X, for the tax year 1998. He reported owing $141,515 as of the date he filed the amended return. Despite reporting that he owed this amount, Boisseau did not pay the liability at the time of filing. As of April 6, 2015, as a result of accumulated interest, Boisseau owed $228,719.04.

5.     On June 11, 2004, Boisseau filed an amended income tax return, Form 1040X, for the tax year 1999. He reported owing $78,662 as of the date he filed the amended return. Despite reporting that he owed this amount, Boisseau did not pay the liability at the time of filing. As of April 6, 2015, as a result of accumulated interest, Boisseau owed $254,947.11.

6.     On December 12, 2001, Boisseau filed an income tax return, Form 1040, for the tax year 2000. He reported owing $22,782 as of the date he filed the return. Despite reporting that he owed this amount, Boisseau only paid $500 at the time of filing. As of April 6, 2015, as a result of accumulated interest, Boisseau owed $55,284.85.

7.     On or about January 28, 2004, Boisseau filed an amended income tax return, Form 1040X, for the tax year 2002. Boisseau reported owing tax of $54,629. Despite reporting that he owed this amount, Boisseau did not pay the liability at the time of filing. As of April 6, 2015, as a result of accumulated interest, Boisseau owed $111,302.01.

8.     On October 17, 2004, Boisseau filed an income tax return, Form 1040, for the tax year 2003. Boisseau reported owing tax due of $62,124. Despite reporting that he owed this amount, Boisseau did not pay the liability at the time of filing. He did not have any tax withheld from his pay that year. As of April 6, 2015, as a result of accumulated interest, Boisseau owed $118,948.28.

9.      On October 17, 2005, Boisseau filed an income tax return, Form 1040, for the tax year 2004. He reported owing $53,901 as of the date he filed the return. Despite reporting that he owed this amount, Boisseau did not pay the amount he reported owing. As of April 6, 2015, as a result of accumulated interest, Boisseau owed $101,505.69.

10.     On October 18, 2006, Boisseau filed an income tax return, Form 1040, for the tax year 2005. Boisseau reported owing $73,879 as of the date he filed the return. Despite reporting that he owed this amount, Boisseau did not pay the liability at the time of filing. As of April 6, 2015, as a result of accumulated interest, Boisseau owed $134,434.53.

11.     On October 9, 2008, Boisseau filed an amended income tax return, Form 1040X, for the tax year 2007. Boisseau reported owing $10,909. Despite reporting that he owed this amount, Boisseau did not pay the liability at the time of filing. As of April 6, 2015, as a result of accumulated interest, Boisseau owed $20,391.37.

12.     On October 9, 2009, Boisseau filed an income tax return, Form 1040, for the tax year 2008. Boisseau reported owing $22,626 as of the date he filed the return. Despite reporting that he owed this amount, Boisseau did not pay the liability at the time of filing. As of April 6, 2015, as a result of accumulated interest, Boisseau owed $32,606.06.

13.     On July 9, 2001, the IRS assessed Boisseau with a trust fund recovery penalty in the amount of $250,929.02. The assessment was made based on the IRS' determination that Boisseau was a responsible officer at the law firm of Turner & Boisseau who willfully failed to pay over the employment taxes withheld from the firm's employees' pay in the second quarter of 1999. Boisseau was a 60 percent owner of the firm at the time.

14.     The IRS also assessed a trust fund recovery penalty against Brian Mauden. In 1999, Mauden was the comptroller for Turner & Boisseau.

15. As comptroller, Mauden informed Boisseau that the firm was unable to pay its payroll taxes. Mauden informed Boisseau that the firm had fallen behind on paying the IRS the trust fund portion of the firm's employment taxes. Mauden advised Boisseau that he should reduce his pay to increase cash flow and allow the firm to pay the liability. Boisseau rejected the idea.

16. Boisseau has made $1,000 in payments toward the trust fund recovery penalty.

17. Other than the $1,000 paid by Boisseau, Mauden made all the other payments toward the liability from the date of assessment to February 21, 2014. Mauden made these payments from his military retirement and social security.

18. By virtue of Mauden's payments, the trust fund recovery penalty assessment was paid off as of February 21, 2014, but the accrued interest remains.

III. **Affirmative Acts of Evasion and Willfulness**

A. *Boisseau uses a nominee owner for his law firm.*

19. Jack McInteer, an attorney from Wichita, testified that in 2005, Boisseau asked him to create a law firm "that Eldon Boisseau would be the manager and primary lawyer in." McInteer assisted Boisseau in creating the Law Offices of Eldon L. Boisseau, LLC. McInteer testified that Boisseau made the ultimate decision to create the Law Offices of Eldon L. Boisseau.

20. In creating the Law Offices of Eldon L. Boisseau, McInteer discussed Boisseau's tax liabilities with him. Boisseau expressed his concern to McInteer about his tax liabilities.

21. On September 19, 2005, McInteer emailed Boisseau that he could "set up the LLC and structure it anyway you want."

22.     Boisseau wanted to design the firm in a manner that would protect the firm's assets from IRS collection. McInteer testified that "if [the law firm] was Eldon Boisseau's business, then the IRS could attach all of the assets," including the firm's accounts receivable. But if "the law firm itself and its assets were not his, then they wouldn't be attachable."

23.     In an email from McInteer to Boisseau and his accountant, Tom Dechant, on November 9, 2005, McInteer stated that "Eldon could own the LLC, but that is just asking for IRS problems. They could get any equity. They also could force a foreclosure by the bank. The smart thing if it is an option is to have someone else own it."

24.     Tom Dechant is a certified public accountant from LaCrosse, Kansas. His accounting firm prepared Boisseau's income tax returns for the years at issue. Dechant also was involved in the email discussions between McInteer and Boisseau regarding the creation of the Law Offices of Eldon L. Boisseau.

25.     On December 16, 2005, Dechant emailed Kimberly Clement, an employee of the Law Offices of Eldon L. Boisseau, stating, "If we were to put Eldon's name as owner that would mess us up with the IRS."

26.     At Boisseau's request, Richard Johnson became, and remains, the sole owner of the Law Offices of Eldon L. Boisseau.

27.     Johnson is a lawyer who practices law in Valley Falls, Kansas.

28.     Johnson's daughter is married to Boisseau's son.

29.     Although Johnson is the sole owner of the Law Offices of Eldon L. Boisseau, he has no day-to-day involvement with the firm. He does not represent any clients or perform any managerial work for the firm. He has never been to its offices.

30.     Johnson testified regarding the firm's operations that he "never really thought it was any of my business."

31.     Johnson did not receive a salary from the law firm. He occasionally received nominal compensation—between $1,000 and $3,000 a year—but he "didn't request anything, didn't expect anything."

32.     Boisseau managed the day-to-day operation of the firm and made all business decisions regarding the firm. Nevertheless, he never had signature authority on any of the firm's checking accounts. Before being assessed the taxes at issue in this case, Boisseau was a partner at the law firm Turner & Boisseau, Chartered. While there, he had signature authority on that firm's accounts.

33.     Boisseau told Clement, the office manager of the Law Offices of Eldon L. Boisseau, that he did not own the law firm because he did not want his personal IRS problems to affect the firm or its accounts.

34.     At the time he created the firm, Boisseau already had been assessed, but failed to pay, tax for 1998–2000 and 2002, and the trust fund recovery penalty. The United States had a federal tax lien on all property belonging to Boisseau.[1] Moreover, the IRS had filed notices of its federal tax liens.

### B.   Boisseau alters his pay arrangement.

35.     McInteer considered it important that Boisseau had an express employment agreement with the Law Offices of Eldon L. Boisseau. In an email dated October 21, 2005, McInteer told Boisseau and his accountant that "it is real important to tie down Eldon's salary and or bonus arrangements. Since he doesn't own the business, that is what he gets. Also, it is

---

[1] *See* 26 U.S.C. §§ 6321-6322.

what the IRS can attach. With Eldon being so important in the business, if we don't have it written down, the IRS will take the position that he owns and is entitled to everything if we aren't clear."

36.     On January 12, 2006, McInteer wrote to Boisseau that he had drafted an employment agreement covering his salary and bonus, adding that "it is important to have an employment agreement in place to obviate any potential ambiguity should the IRS come after you."

37.     McInteer anticipated when he helped Boisseau set up the Law Offices of Eldon L. Boisseau that the IRS would garnish Boisseau's salary and bonus.

38.     Johnson signed the employment agreement as the owner and employer, but he did not know how the salary was determined.

39.     In 2007, Rita Bleazard, a revenue officer for the Internal Revenue Service, was assigned to collect taxes owed by Boisseau.

40.     Among other things, Bleazard researched potential levy sources to collect the taxes. She identified a personal checking account with Bank of America and wages from the Law Offices of Eldon L. Boisseau.

41.     On November 30, 2007, Bleazard sent Boisseau a "Notice of Intent to Levy." The notice stated, "If you don't pay the amount you owe, make alternative arrangements to pay, or request Appeals consideration within 30 days from the date of this letter, we may take your property, or rights to property, such as real estate, automobiles, business assets, bank accounts, wages, commission, and other income."

42.     Within 30 days of the notice, Boisseau did not pay the amount he owed, make alternative arrangements to pay, or request appeals consideration.

43.     On December 5, 2007, Bleazard spoke with Dechant, Boisseau's power of attorney at the time. Bleazard informed Dechant that she needed a financial statement from Boisseau and a copy of his 2006 income tax return by January 15, 2008. Bleazard stated that she would levy Boisseau's income and assets if she did not receive this information by that date.

44.     At the time, most of Boisseau's income was from wages he received from the Law Offices of Eldon L. Boisseau.

45.     Boisseau did not provide Bleazard with the materials she had requested by January 15, 2008.

46.     On January 23, 2008, Bleazard levied Boisseau's personal checking account at Bank of America.

47.     From January 1, 2006, through the date of the levy, the Law Offices of Eldon L. Boisseau paid Boisseau's salary by direct deposit. His paychecks were deposited directly into his checking account at Bank of America.

48.     Clement had access to Boisseau's checking account to pay his personal bills. She tried to check his account balance online on a daily basis.

49.     On February 5, 2008, Clement noticed that Boisseau's checking account had been swept. She informed Boisseau that it was swept pursuant to an IRS levy.

50.     That day, Boisseau told Clement: "If they're going to levy my account, then you know, if I work and I take a paycheck, they're just going to take the money, so I'll just continue to work on the cases, bring the money into the firm, but I'll just no longer take a paycheck." The defense offered nothing at trial to rebut Boisseau's admission.

51.     Following his statement to Clement, Boisseau dictated a letter that stated the following: "To Whom It May Concern: I hereby resign from the Law Offices of Eldon L.

Boisseau, L.L.C. I will continue to work, but I want to terminate my pay agreement. Pending resolution of other issues, I want to cancel any pay agreement I have with the firm."

52.     On February 15, 2008, Bleazard—just as she had warned—served a wage levy on the Law Offices of Eldon L. Boisseau for wages owed to Boisseau. The levy stated, "This levy requires you to turn over to us: (1) this taxpayer's wages and salary that have been earned but not paid, as well as wages and salary earned in the future until this levy is released, (2) this taxpayer's other income that you have now or for which you are obligated."

53.     A wage levy, unlike a bank levy, is continuous.

54.     Because Boisseau had intentionally altered his compensation from the firm in anticipation of the wage levy, the firm never paid the IRS any money in response to the levy.

55.     On August 22, 2008, Bleazard served a final demand on the Law Offices of Eldon L. Boisseau, demanding that it honor the wage levy. On August 26, 2008, in response to the final demand, the Law Offices of Eldon L. Boisseau sent Bleazard a letter stating that "neither Eldon or Janet [Boisseau] have received any pay in this time period, so there is no payment for the firm to make/give to the IRS." The firm enclosed ADP payroll records showing the Boisseaus no longer received paychecks. Nothing in the letter indicated that Boisseau was being compensated in another manner after resigning.

56.     Johnson did not know that Boisseau had resigned. Johnson testified that he did not "know anything about that at all."

57.     After Boisseau resigned from the Law Offices of Eldon L. Boisseau, the firm continued to compensate him for his work. From February 15, 2008, through August 11, 2009, Boisseau did not take a paycheck. Rather than issuing a paycheck, the firm paid all of Boisseau's personal expenses directly from the firm's checking account.

58. During the period that the firm paid all of Boisseau's personal expenses, the firm paid among other things: (1) the rent for Boisseau's personal residence, (2) the utilities for his personal residence, (3) life insurance premiums for policies on Boisseau and his wife, (4) car insurance premiums, (5) lease payments on a GMC Denali driven by Boisseau, (6) lease payments on a Cadillac driven by Boisseau, and (7) groceries and other consumer goods from Dillons grocery store.

59. The firm did not regularly make these payments before the IRS bank levy and Boisseau's resignation from the law firm.

60. The firm did not compensate any other employee in this manner.

61. As a form of compensation, the firm also paid personal travel expenses for Eldon and Janet Boisseau, including: (1) airline tickets to London for personal travel, (2) lodging expenses for personal travel to Ecuador and Peru, (3) an $11,000 payment to a travel agency, (4) hundreds of dollars in scuba equipment, (5) airline tickets to the 2009 Super Bowl, and (6) unidentified expenses from the Boisseaus' trip to the Super Bowl.

62. Many of the personal expenses paid for by the Law Offices of Eldon L. Boisseau were charged to credit cards held in the name of Boisseau's brother. Boisseau used the cards for personal expenses and then used the checking account of his law firm—an account for which he had no signature authority—to pay those expenses.

63. The Law Offices of Eldon L. Boisseau accounted for the firm's payment of Boisseau's personal expenses in a QuickBooks account numbered 114 and designated for receivables owed to the firm by Boisseau.

64.     Clement made the entries in the 114 account based on checks she wrote from the firm's checking account to pay expenses that she knew were personal. She consulted with Boisseau to determine which expenses were personal and which were not.

65.     Clement sent a general ledger, which included the 114 account, to Dechant each year for Dechant or his firm to prepare Boisseau's federal income tax return as well as the Schedule C for Johnson as the owner of the firm.

66.     When Dechant received the general ledger to prepare Boisseau's 2008 income tax return, he learned that Boisseau had stopped drawing a paycheck and was instead being compensated by having the firm directly pay his personal expenses.

67.     Boisseau did not consult with Dechant before terminating his salary and having the law firm pay his personal expenses instead of receiving a paycheck. At the time the Law Offices of Eldon L. Boisseau was created, Dechant advised Boisseau via email, "The new entity cannot pay any personal credit card charges for you. You MUST pay these yourself." He further advised, "if the IRS garnishes some of [Boisseau's monthly salary], you still cannot draw any more money." He added, "All non-business charges must be paid by you." Finally, he advised that Boisseau "should forego any foreign, or expensive domestic, business travel that is not billable to a client" and he should not have the firm pay for his wife's travel.

68.     Dechant believed that Boisseau had to live within these parameters while at the Law Offices of Eldon L. Boisseau, in part, because the IRS was "lurking." Dechant informed Boisseau that he "can't believe that the IRS has not lowered the boom yet, but they will."

69.     Boisseau tried to live within these parameters until the IRS levied his checking account and he knew that the IRS was going to levy his wages. Once it was clear that the IRS was going to levy his wages and jeopardize his lifestyle, Boisseau: (1) lived entirely off of the

firm without drawing a paycheck, (2) had the firm pay all personal credit card expenses, (3) had the firm pay for foreign travel not billable to any client, and (4) had the firm pay for his wife's travel. The IRS levy, and Boisseau's knowledge that his wages would be levied, caused him to dramatically alter his financial affairs.

70.     According to Dechant, "few, if any" of his clients compensate their employees by paying all of their personal expenses directly instead of paying a salary. Dechant testified that the Law Offices of Eldon L. Boisseau is possibly the only one of his clients to do this.

71.     Boisseau did not consult Johnson about having the firm directly pay his living expenses instead of taking a wage. Johnson did not know that the law firm, which he purportedly owned, was paying Boisseau's living expenses.

72.     By altering his compensation from the Law Offices of Eldon L. Boisseau from wages to direct payment of personal expenses, Boisseau shifted his compensation from a manner of payment subject to a continuing IRS wage levy to a payment method that was not. Boisseau continued this practice "pending resolution of other issues," which were IRS collection efforts.

73.     After resigning in response to the IRS bank levy and in anticipation of its wage levy, Boisseau did not take a paycheck again until August 11, 2009. He took four paychecks in 2009, the last on November 6, 2009. These dates—August 11 and November 6—correspond with the dates that Boisseau submitted a proposed installment agreement to Bleazard and the date she rejected it.

74.     The timing is significant because, as a matter of law, the IRS may not engage in any enforced collection activity, including levying wages, while a proposed installment agreement is pending.[2]

_____

[2] 26 C.F.R. § 301.6331-4.

75. After the IRS rejected Boisseau's proposed installment agreement, he again stopped taking a paycheck. Boisseau started taking paychecks again on the first week of February 2010. That same week, Boisseau filed a petition for bankruptcy.

76. As a matter of law, the IRS cannot collect tax, including through levy, while a bankruptcy is pending.[3] Thus, from the time Boisseau learned about the levy on the bank account—February 5, 2008—through 2010, he only drew a paycheck at times when the IRS was precluded by law from levying his wages.

77. Given the firm's gross annual receipts, there is no reason for the Law Offices of Eldon L. Boisseau to have regularly paid Boisseau wages in 2006 and 2007 but not for most of 2008 and 2009. Between 2006 and 2009, the Law Offices of Eldon L. Boisseau had the following gross receipts:

| 2006 | 2007 | 2008 | 2009 |
|------|------|------|------|
| $535,838 | $702,420 | $665,418 | $697,633 |

### C. Boisseau admits resigning because of the levy but misrepresents other facts.

78. On July 23, 2009, Bleazard interviewed Boisseau. During the interview, Boisseau told Bleazard that he stopped taking a paycheck because the IRS had levied his bank account and he did not intend to draw a paycheck again until the IRS released its wage levy. Boisseau offered no evidence at trial to rebut Bleazard's testimony regarding Boisseau's statement.

79. Boisseau told Bleazard that he was not receiving any compensation from the Law Offices of Eldon L. Boisseau. When asked how he was paying personal expenses, Boisseau told Bleazard only that his children and other family members were paying his personal expenses.

---

[3] *See* 11 U.S.C. § 362.

80.     Bleazard testified that she reviewed her history to prepare for her testimony. The history is like a journal or diary that revenue officers keep on an ongoing basis regarding their collection efforts.

### D.   Boisseau proposes installment payment plans but never in good faith.

81.     On August 11, 2009, Boisseau submitted a proposed installment agreement. He offered to pay $600 a month. This proposal would not provide for full payment within the statute of limitations for collections. The amount also was determined—contrary to IRS policy—by comparing Boisseau's monthly income to his actual expenses, rather than the standardized, allowable expenses that the IRS must use.

82.     The IRS did not accept Boisseau's proposal because Boisseau was not current on his estimated payments for 2009 and because he had the ability to pay significantly more based on the difference between his monthly income and allowable expenses. The IRS proposed monthly payments of $3,490, but Boisseau did not accept that offer.

83.     With exceptions not relevant to this case, IRS policy requires the use of standardized, allowable expenses, rather than actual expenses, to determine a taxpayer's ability to pay. Under its policy, the IRS cannot enter into an installment agreement for a monthly payment based on the difference between monthly income and actual expenses. Instead, the IRS can accept only an amount equal to the difference between monthly income and allowable expenses. The IRS also cannot accept a proposed installment agreement if the taxpayer is not making sufficient estimated payments or withholdings on his current tax liabilities.

84.     Dechant testified that he proposed an installment agreement on Boisseau's behalf sometime while Boisseau was working at the Klenda Mitchell law firm. But during that entire period, Boisseau was never current on his federal income taxes.

85.     In 2004, the IRS proposed an installment plan that would have allowed Boisseau $6,839 a month for living expenses based on the monthly income he had reported to the IRS. Boisseau did not accept the proposal.

## CONCLUSIONS OF LAW

86.     Under 26 U.S.C. § 7201, "Any person who willfully attempts in any manner to evade or defeat any tax imposed by [the Internal Revenue Code] or payment thereof shall . . . be guilty of a felony."

87.     Section 7201 prohibits a single crime—attempted evasion of tax—that can be committed in two distinct manners: (a) the willful attempt to evade or defeat the assessment of a tax and (b) the willful attempt to evade or defeat the payment of a tax.[4] This case involves the willful attempt to evade or defeat the payment of a tax.

88.     The United States must prove three elements: (1) the existence of a substantial tax liability, (2) an affirmative act constituting an evasion or attempted evasion of the tax, and (3) willfulness.[5]

## I.      Boisseau's Substantial Tax Liability

89.     Although the United States must prove a substantial tax liability, it need not prove the exact amount of taxes owed.[6]

90.     As of April 6, 2015, Boisseau owed the IRS more than $1 million.

91.     The United States has proven beyond a reasonable doubt that Boisseau has a substantial tax due and owing. Boisseau self-reported his liabilities on his federal income tax

---

[4] *See United States v. Howell*, 1996 WL 413583, at *5 (D. Kan. June 18, 1996).

[5] *Sansone v. United States*, 380 U.S. 343, 351 (1956); *United States v. Meek*, 998 F.2d 776, 779 (10th Cir. 1993).

[6] *United States v. Harrold*, 796 F.2d 1275, 1278 (10th Cir. 1986).

returns or amended returns. Also, the United States introduced a certificate of assessment regarding the trust fund recovery penalty. The certificate of assessment is prima facie evidence of that liability. Because it was unrebutted, it suffices to prove the liability.[7]

92.     Refusal to pay taxes while possessing funds sufficient to pay the liability, without more, does not constitute willful evasion of payment.[8] The United States must prove that Boisseau engaged in an affirmative act with the specific intent of evading payment.[9]

93.     The tax liabilities in this case are undisputed. Consequently, the case turns on Boisseau's acts, and more importantly, his intent.

## II.     Boisseau's Affirmative Acts of Evasion

94.     The type of affirmative acts a defendant can take in an attempt to evade the payment of tax are virtually limitless. As one appellate court noted, "It cannot be expected that all tax payment evaders approach their problem in the same way."[10] This is why the statute prohibits attempts to evade "in *any* manner."[11] The Supreme Court has declined to define or limit the manner in which a taxpayer may evade for fear of restricting the statute's scope.[12]

---

[7] *United States v. Chisum*, 502 F.3d 1237, 1244 (10th Cir. 2007). Although the trust fund recovery penalty is referred to as a "penalty," it is considered a tax for purposes of 26 U.S.C. § 7201. *United States v. Farr*, 701 F.3d 1274, 1287 (10th Cir. 2012); 26 U.S.C. § 6701(a).

[8] *Spies v. United States*, 317 U.S. 492, 499 (1943).

[9] *Id.*

[10] *United States v. Conley*, 826 F.2d 551, 558 (7th Cir. 1987).

[11] 26 U.S.C. § 7201 (emphasis added).

[12] *See Spies*, 317 U.S. at 499 ("Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation. Nor would we by definition constrict the scope of the Congressional provision that it may be accomplished 'in any manner.' ").

95.     Generally, for tax evasion purposes, "any conduct, the likely effect of which would be to mislead or to conceal" is sufficient to prove an affirmative attempt to evade tax.[13] Although proof of an act intended to mislead or conceal will suffice, it is not necessary. While "evasion-of-payment cases will almost invariably involve some affirmative acts of fraud or deceit, it is still true that the elements of tax evasion pursuant to § 7201 do not *necessarily* involve fraud or deceit."[14] For example, a taxpayer could file a truthful tax return but then evade payment by intentionally—but openly—attempting to move his assets outside the reach of the IRS.[15] Thus, "it is possible to willfully evade or defeat payment of a tax under § 7201 without making any misrepresentation."[16]

96.     Even "a lawful activity in-and-of-itself, can serve as an 'affirmative act' supporting a conviction under § 7201 if it is done with the *intent to evade income tax*."[17]

97.     The defendant's intent in committing the affirmative act need not be solely to evade payment. Rather, "if the tax-evasion motive plays *any part* in such conduct the offense may be made out even though the conduct may also serve other purposes."[18]

---

[13] *Id.*; *United States v. McGill*, 964 F.2d 222, 230 (3d Cir. 1992) (quoting *Spies*, 317 U.S. at 499).

[14] *Kawashima v. Holder*, 132 S. Ct. 1166, 1175 (2012).

[15] *Id.*

[16] *Id.*

[17] *United States v. Jungles*, 903 F.2d 468, 474 (7th Cir. 1990) (noting that taxpayer's entry into an independent contractor agreement and change in manner of compensation, although independently legal, constituted evasion of payment); *see also McGill*, 964 F.2d at 232-33 (finding that lawyer evaded payment by depositing money into office expense account and wife's checking account rather than his personal checking account following IRS levy on that account); *United States v. Daniel*, 956 F.2d 540, 542-43 (6th Cir. 1992) (noting that defendant used other people's credit cards, used cash extensively, and placed business and personal assets in other people's names); *Conley*, 826 F.2d at 556-57 (concluding that lawyer who filed tax returns without paying taxes intended to evade payment of taxes by using nominees and cash to pay other creditors).

[18] *Spies*, 317 U.S. at 499 (emphasis added).

98.     Moreover, the defendant need not succeed in evading tax through his affirmative act. It is the attempt—successful or not—that constitutes the crime.[19]

99.     Finally, "[t]he government only need[s] to show *one* affirmative act of evasion" to prevail.[20] Thus, the United States "need not prove each affirmative act alleged."[21]

100.    The evidence in this case proves beyond a reasonable doubt that Boisseau committed at least one affirmative act with the intent of evading payment.

101.    Boisseau used a nominee to own the Law Offices of Eldon L. Boisseau, LLC. There is no reasonable doubt that Johnson was nothing more than a nominee owner of the law firm. Johnson contributed nothing, did nothing, and received nothing. By Johnson's admission, he did not consider the business that he technically owned to be "any of my business."

102.    The evidence also shows beyond a reasonable doubt that Boisseau made Johnson the owner in part—if not entirely—in an attempt to place the firm's assets outside the reach of the IRS. Among other things, Boisseau set up the law firm after the IRS had assessed tax and filed notices of federal tax liens. Unlike with Turner & Boisseau, Boisseau had no ownership interest in the Law Offices of Eldon L. Boisseau and kept his name off the firm's checking account. Boisseau told his office manager that Johnson owned the firm so that Boisseau's tax problems would not affect the firm's assets or accounts. Moreover, Boisseau's agents—McInteer and Dechant—clearly stated in correspondence that Boisseau used Johnson to prevent the IRS from trying to collect from the firm's assets, particularly its accounts receivable. They testified to

---

[19] *Id.*

[20] *United States v. Hoskins*, 654 F.3d 1086, 1091 (10th Cir. 2011) (quoting *United States v. Thompson*, 518 F.3d 832, 852 (10th Cir. 2008)); *McGill*, 964 F.2d at 229 ("One act will suffice.").

[21] *United States v. Mackey*, 571 F.2d 376, 387 (7th Cir. 1978).

the same effect at trial. Given these facts, there is not even a plausible explanation for Boisseau's use of Johnson other than attempting to keep assets outside the reach of the IRS.

103.    The use of a nominee to own personal or business assets is a common affirmative act of evasion supporting a conviction.[22]

104.    Boisseau also resigned from the Law Offices of Eldon L. Boisseau and altered his compensation from the law firm in an attempt to prevent or defeat an IRS levy on his wages.

105.    After resigning, Boisseau chose to have the firm pay all of his living expenses directly rather than receive a paycheck. Compelling circumstantial and direct evidence proves beyond a reasonable doubt that Boisseau altered his compensation to evade the IRS' collection activity. Boisseau drew a paycheck for two years while the IRS was relatively inactive in its collection efforts. He resigned and stopped taking a paycheck a week after the IRS issued a bank levy and the *same day* that he learned the bank swept his checking account. He told his office manager that "if I work and I take a paycheck, they're just going to take the money." Thereafter, Boisseau took paychecks only when the IRS was unable to levy. Finally, in a meeting with Bleazard, Boisseau admitted that he was not drawing a paycheck because of the IRS levy.

106.    Although there is no requirement that a tax evader evade in the same manner as other convicted evaders, Boisseau's conduct is similar to that of at least two other lawyers convicted of evading payment.[23] Both *United States v. McGill* and *United States v. Conley* involved attorneys who filed accurate tax returns but failed to pay the amount they reported

---

[22] *See United States v. Hook*, 781 F.2d 1166, 1168 (6th Cir. 1986) (describing defendant who formed corporation making his wife and daughters nominee owners); *Conley*, 826 F.2d at 555-56 (describing lawyer who evaded payment by titling home in his sons' names to avoid seizure by the IRS); *Cohen v. United States*, 297 F.2d 760, 762 (9th Cir. 1962) (describing defendant who "placed his assets in the name of others . . . [and] caused his obligations to be paid through and in the name of others . . . for the purpose of defeating the payment of his income tax liabilities.").

[23] *See McGill*, 964 F.2d 222; *Conley*, 826 F.2d 551.

owing. In both cases, the IRS eventually levied the lawyers' personal checking accounts.[24] Both lawyers, in response to the levy, stopped using the levied accounts and instead used accounts in others' names or containing others' names.[25] They did so in direct response to a successful IRS levy on their personal checking accounts, hoping that rearranging their financial affairs would prevent or defeat a future levy.[26]

107.   *McGill* is illuminating because the defendant simply switched to using a business account for a business that included his name—the "McGill & Seay" account.[27] The Third Circuit affirmed the conviction, holding that "banking through a business account containing the names of others . . . suffices as an affirmative act."[28] More importantly, the evidence sufficed for a jury to conclude that the defendant switched to his professional account to prevent further IRS levies after the IRS successfully levied the defendant's personal checking account.[29] The defendant testified that he switched to the business account "thinking that the IRS wouldn't bother the money" in that account.[30] Moreover, he knew that once the IRS had levied his personal bank account, "any money he put into an account in his own name 'would be taken.' "[31]

---

[24] *McGill*, 964 F.2d at 227; *Conley*, 826 F.2d at 555.

[25] *McGill*, 964 F.2d at 227-28; *Conley*, 826 F.2d at 555-57.

[26] *McGill*, 964 F.2d at 227-28; *Conley*, 826 F.2d at 555-57.

[27] The defendant also switched to using his wife's checking account, an act the Third Circuit considered sufficiently affirmative and evasive to sustain a conviction. *McGill*, 964 F.2d at 233.

[28] *Id.*

[29] *Id.*

[30] *Id.* at 228.

[31] *Id.* at 232. The Third Circuit held that merely switching to a bank account exclusively in the defendant's name and not voluntarily reporting the change to the IRS cannot amount to an affirmative act of evasion. *Id.* at 233. In such situations, unlike in the present case, that act is not an attempt to place the assets outside the reach of an IRS levy.

108.    There are parallels between Boisseau and the defendant in *McGill*. In both cases, the IRS levied the personal checking account of a lawyer who reported owing taxes but did not pay them. In *McGill*, following the IRS' successful levy of his personal checking account, the defendant presumed any money placed in that account would be levied. In this case, following the IRS' successful levy of his personal checking account, Boisseau correctly presumed that any future paycheck—whether directly deposited in his checking account or not—would be levied. In *McGill*, following the IRS' successful levy, the defendant used his business banking account believing the IRS would not levy the money he deposited there. In this case, following the IRS' successful levy of his checking account, Boisseau used his nominee business' "114 account" instead of taking a paycheck because he believed—again, correctly—that the IRS could not levy that form of compensation. Boisseau, going a step further than the defendant in *McGill*, then used the checking account of his nominee-owned business—for which he had no signature authority—to pay all of his expenses.[32] In broad strokes, both lawyers altered their financial affairs in response to an IRS levy on a personal checking account in an attempt to defeat future levies. The defendant in *McGill* was convicted, and his conviction was affirmed. Boisseau's affirmative act is sufficient to support his conviction as well.

109.    Additionally, altering one's manner of compensation to prevent the payment of tax constitutes an affirmative act of evasion.[33] That is exactly what Boisseau did. To prevent his compensation from being levied, he affirmatively switched from a form of compensation that could be levied—wages—to one that, as a practical matter, could not be levied—the firm's direct

---

[32] *See United States v. Trupin*, 119 Fed. Appx. 323, 326 (2d Cir. 2005) (affirming conviction of defendant who "repeatedly used surrogates to pay his bills").

[33] *See Jungles*, 903 F.2d at 473-74 (noting that taxpayer evaded payment by having employer alter his status from employee to independent contractor to prevent his employer from paying withholding tax to the IRS).

payment of all personal expenses through a nominee-owned business account. Although the defendant in *Jungles* attempted to evade in additional ways, that evasive act alone—altering his compensation agreement with his employer to evade payment of tax—suffices for a conviction for tax evasion.[34]

110.    Boisseau also concealed the alteration in his compensation from the IRS and affirmatively misrepresented the nature of his compensation. First, in response to the IRS' final demand served six months after the wage levy, the Law Offices of Eldon L. Boisseau—managed and controlled by Boisseau—responded in writing that "neither Eldon or Janet [Boisseau] have received any pay" from the law firm. Boisseau had received pay, just not in the form of a paycheck. Nearly a year later, Boisseau personally told Bleazard during an interview that the Law Offices of Eldon L. Boisseau did not compensate him following his resignation from the law firm. Consequently, according to Boisseau, he relied exclusively on friends and family to pay his living expenses. Both statements were false. Boisseau was being compensated without receiving a paycheck. Moreover, although his brother allowed him to use credit cards in his name, those bills were paid by the law firm not by family members. Thus, Boisseau's nominee-owned law firm, and not Boisseau's family, was paying for Boisseau's personal expenses.[35]

---

[34] *See Hoskins*, 654 F.3d at 1091.

[35] The use of credit cards held in others' names also evinces Boisseau's intent to conceal from the IRS the fact that the firm was compensating him and paying for his personal—and sometimes lavish—living expenses. *See United States v. Schoppert*, 362 F.3d 451, 454 (8th Cir. 2004) (affirming conviction against defendant who "attempted to evade the payment of more than $450,000 in federal income taxes by making extensive use of cash, *obtaining assets using a third party's credit card*, and making false statements to Internal Revenue Service (IRS) agents attempting to collect his taxes.") (emphasis added); *see also Daniel*, 956 F.2d at 543 (affirming conviction against defendant who stopped filing returns and "began to use other individuals' credit cards for business and personal expenses"). By having the nominee-owned firm pay for personal expenses charged to a credit card in another's name, Boisseau made it all the more difficult for the IRS to discern that he was being compensated by the firm after his resignation.

111.    Making false statements to the IRS constitutes an affirmative act of evasion.[36]

## III.    Boisseau Acted Willfully

112.    "Willfulness" means the "voluntary, intentional violation of a known legal duty."[37] Willfulness does not require a "bad purpose" or "evil motive."[38]

113.    Proof of willfulness can be, and usually is, based on circumstantial evidence.[39] Willfulness can be inferred from a defendant's conduct.[40]

114.    Willfulness is "closely connected" to the affirmative act element of § 7201.[41] In fact, "if the affirmative act element is satisfied, there is no question that willfulness is also present."[42]

115.    For the reasons stated above, the evidence in this case proves beyond a reasonable doubt that Boisseau committed each affirmative act discussed above with the specific intent of evading payment of taxes. Thus, Boisseau acted willfully.

116.    Moreover, there is no doubt that Boisseau knew of his legal obligation to pay the taxes at issue. He admitted to owing the liabilities and having to pay them on his income tax returns, on his bankruptcy schedule, and on a proposed installment agreement. As a sophisticated

---

[36] *See United States v. Gonzalez*, 58 F.3d 506, 509 (10th Cir. 1995) (describing defendant who misrepresented assets on financial statement and letter submitted to the IRS); *United States v. Brimberry*, 961 F.2d 1286, 1291 (7th Cir. 1992) (describing defendant who excluded collectible assets from financial statement submitted to the IRS).

[37] *Hoskins*, 654 F.3d at 1090 (quoting *Cheek v. United States*, 498 U.S. 192, 201 (1991)).

[38] *United States v. Afflerbach*, 547 F.2d 522, 524 (10th Cir. 1976).

[39] *Thompson*, 518 F.3d at 850-52.

[40] *United States v. Melot*, 732 F.3d 1234, 1241 (10th Cir. 2013).

[41] *McGill*, 964 F.2d at 237 (quoting *United States v. Romano*, 938 F.2d 1569, 1572 (2d Cir. 1991)).

[42] *Id.* (quoting *Romano*, 938 F.2d at 1572); *see also United States v. Shelton*, 669 F.2d 446, 459 ("Affirmative acts to avoid payment of any tax . . . constitute evidence of willfulness.").

attorney with decades of experience, Boisseau is all the more aware of his obligation to report his income taxes and to pay them.[43]

117.    Finally, in choosing to place his law firm in the hands of a nominee, in altering his compensation to defeat a wage levy, and misrepresenting the nature of his compensation to the IRS, Boisseau acted "voluntarily, purposefully, deliberately, and intentionally, as distinguished from accidentally, inadvertently, or negligently."[44]

118.    During summation at trial, the defense made a number of legal arguments that merit brief response. First, the defense argued that Boisseau was somehow not guilty because he did not commit a "constellation of acts." The law does not require that. "One act will suffice."[45]

119.    Second, the defense seemed to argue that Boisseau was not willful because the United States allegedly abandoned some of the affirmative acts alleged. But the United States "need not prove each affirmative act alleged."[46]

120.    Third, the defense argued that Boisseau must engage in acts that "mislead or conceal." For starters, Boisseau did mislead or conceal. Using a nominee to prevent IRS collection is inherently misleading. Paying for living expenses using a checking account owned by a nominee-owned firm—for which Boisseau had no signature authority—is inherently misleading. Lying to the IRS about one's compensation and payment of personal expenses is inherently misleading. Regardless, the U.S. Supreme Court recently has concluded that in

---

[43] *See United States v. Guidry*, 199 F.3d 1150, 1157-58 (10th Cir. 1999) (inferring willfulness from defendant's expertise in accounting by means of her business degree and her work experience as comptroller of company); *see also Conley*, 826 F.2d at 556 ("Defendant had more than ample notice that the IRS was attempting to collect what he owed, and as a lawyer, he should have required little notice.").

[44] *United States v. Dillon*, 566 F.2d 702, 704 (10th Cir. 1977).

[45] *McGill*, 964 F.2d at 229.

[46] *Mackey*, 571 F.2d at 387.

"evasion-of-payment cases . . . the elements of tax evasion . . . do not *necessarily* involve fraud or deceit."[47] Misleading the IRS or concealing assets is a sufficient, but not a necessary, condition of the offense.[48] Intentionally attempting to place assets outside of the government's reach, with or without misleading or concealing, violates the statute.[49] That is what Boisseau did.

121.    Boisseau intentionally engaged in this conduct because IRS collection, particularly its wage levy, jeopardized his lifestyle.[50]

122.    The defense also argued that Boisseau did not evade as much, or in as egregious a manner, as defendants in other reported cases. The argument is misguided. The law does not require each tax evader to evade in the same scope, manner, or magnitude.[51] Even if Boisseau was less evasive than others convicted of violating § 7201, that does not mean he was not evasive enough to violate the law. He was, and he did.

**IV.    Conclusion**

123.    Boisseau has a substantial tax due and owing. With a substantial tax due and owing, Boisseau willfully committed at least one affirmative act with intent to evade payment of that tax. Accordingly, the Court finds Boisseau guilty of tax evasion under 26 U.S.C. § 7201.

---

[47] *Kawashima*, 132 S. Ct. at 1175.

[48] *Id.*

[49] *See id.*

[50] *See Conley*, 826 F.2d at 556 (rejecting argument that guilty verdict was " 'knee jerk' reaction by the jury to a lawyer who reported a gross income of $1,030,000 for the period, owed $135,000 in taxes, lived in a nice house, drove a Buick and a Cadillac, owned race horses and traveled throughout the United States and Europe for recreation. Those aspects of the defendant's life were obviously part of the picture considered by the jury, but rightly so.").

[51] *See id.* at 557 ("The defendant here seems to argue that because his conduct was not as egregious as that of Cohen, he should not be convicted of the same crime. *Cohen*, however, does not set a minimum level of wrongful conduct below which one may not be convicted of willful attempt to evade payment of taxes."); *McGill*, 964 F.2d at 233 (affirming conviction even though "[w]e are not presented here with evasion of the magnitude of [other reported decisions.]").

124.    Sufficient evidence was presented to the Court to reach a determination of guilt. Therefore, the Court denies Boisseau's Motion for Judgment of Acquittal (Doc. 59).

125.    Likewise, the Court denies Boisseau's Request for a Finding of Not Guilty After Bench Trial (Doc. 61).

126.    Sentencing is set for 10:30 a.m. September 28, 2015.

**IT IS THEREFORE ORDERED** that Eldon Boisseau is **GUILTY** of tax evasion in violation of 26 U.S.C. § 7201.

**IT IS FURTHER ORDERED** that Boisseau's Motion for Judgment of Acquittal (Doc. 59) is **DENIED**.

**IT IS FURTHER ORDERED** that Boisseau's Request for a Finding of Not Guilty After Bench Trial (Doc. 61) is **DENIED**.

**IT IS FURTHER ORDERED** that sentencing is set for 10:30 a.m. September 28, 2015.

**IT IS SO ORDERED**.

Dated this 7th day of July, 2015.


ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE